# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

|  |  |
|---|---|
| CHARLES ANDERSON McKUHN, JR., | )<br>)<br>) |
| Movant, | )<br>) Cv. No. 2:14-cv-02078-JPM-tmp |
| v. | ) Cr. No. 2:10-cr-20170-JPM<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Respondent. | )<br>) |

### ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255, DENYING CERTIFICATE OF APPEALABILITY, CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Before the Court is the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion") filed by Movant, Charles Anderson McKuhn, Jr., Bureau of Prisons register number 23556-076, an inmate at the Federal Correctional Institution Low in Forrest City, Arkansas. (§ 2255 Mot., *McKuhn v. United States*, No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1.) For the reasons stated below, the Court DENIES Movant's § 2255 Motion.

## I. BACKGROUND

### A. Case Number 10-20170

On April 20, 2010, a federal grand jury returned a five-count indictment against McKuhn. (Indictment, *United States v. McKuhn*, No. 10-cr-20170-JPM (W.D. Tenn.), ECF No. 12.) On January 12, 2011, the grand jury returned a seven-count superseding indictment. (Superseding Indictment, *id.*, ECF No. 76.) Each of the counts involved the following scheme to defraud:

1. At all times material to this indictment, **CHARLES A. McKUHN, JR.,** operated and owned at least two companies, Intersec Capital Trust and Taurian Worldwide, Incorporated (Taurian).

2. Beginning on or about June 1, 2007 and continuing to on or about August 25, 2009, in the Western District of Tennessee, and elsewhere, the defendant,

    ---------------**CHARLES A. McKUHN, JR.**---------------

    did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises to various individuals and institutions, by representing himself as a legitimate debt reduction service, and international private banker, able for a front-end fee to reduce the debt owed by individuals and institutions and establish lines of credit and secured loans for building projects.

3. As a part of said scheme to defraud, the defendant, **CHARLES A. McKUHN, JR.,** began recruiting churches into his debt reduction plan in 2009. Over several months during this time, the defendant, **CHARLES A. McKUHN, JR.,** traveled to several states to personally meet with Pastors and church officials to represent himself as a banker. He also persuaded several churches to commit to paying large sums of money for debt reduction and lines of credit. During this period of time, he also recruited church officials and Ministers to accompany him to other churches to conduct meetings in which other churches paid defendant, **CHARLES A. McKUHN, JR.,** or his representatives, large amounts of money in order to reduce church debt and fund building programs.

4. It was further part of the scheme to defraud, that the defendant, **CHARLES A. McKUHN, JR.,** or his representatives, collected thousands of dollars in advanced fees promising to a number of churches that for that amount, he could reduce the debts of said churches and fund various building projects for said churches.

5. It was further part of the scheme to defraud, the churches that owed debts to banks or other financial institutions were advised that they should not pay these institutions, but should forward any payments to Taurian, or other representatives of defendant, **CHARLES A. McKUHN, JR.,** and as a result, many of these churches became delinquent in their legitimate debts to financial institutions and face foreclosure.

6. It was further a part of said scheme to defraud, that defendant, **CHARLES A. McKUHN, JR.,** or his representatives, took absolutely no legitimate action to either reduce the debt of any church or individual, nor was any

> building project actually funded for any church or individual. All monies collected by defendant, **CHARLES A. McKUHN, JR.,** his representatives, or companies, were used for the benefit of defendant, **CHARLES A. McKUHN, JR.,** his representatives, or companies, and no benefit accrued to any customer of any company controlled by the defendant, **CHARLES A. McKUHN, JR.**

(*Id.* at 1-3.)

Counts 1 and 2 charged McKuhn with engaging in two acts of mail fraud for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C. § 1341. Specifically, Counts 1 and 2 charged that, on June 4, 2009, and on May 11, 2009, respectively, a check in the amount of $3200 was mailed from a church to Taurian in Memphis, Tennessee.

Counts 3 through 6 charged McKuhn with causing interstate wire transfers of money for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C. § 1343. Count 3 charged that, on August 25, 2009, McKuhn caused $85,000 to be wired from the State of Virginia to the State of Tennessee. Count 4 charged that, on July 22, 2009, McKuhn caused $110,000 to be wired from the State of Virginia to the State of Tennessee. Count 5 charged that, on June 29, 2009, McKuhn caused $102,000 to be wired from the State of Virginia to the State of Tennessee. Count 6 charged that, on June 22, 2009, McKuhn caused $75,000 to be wired from the State of Virginia to the State of Tennessee.

Count 7 charged that, on or about July 28, 2009, McKuhn caused the issuance of a check from the account of Intersec Capital Trust to Bud Davis Cadillac in the amount of $52,500, said money having been derived from wire fraud, in violation of 18 U.S.C. § 1957.

The factual basis for these charges is set forth in the opinion of the United States Court of Appeals for the Sixth Circuit on direct appeal:

> Even though McKuhn charmed people into parting with their money over false promises related to financial instruments rather than band instruments, his scheme was not complex—more Harold Hill than Bernie Madoff. He would

> identify individuals struggling to make their monthly mortgage payments and promise he could reduce their debts for an upfront fee. He added sophisticated-sounding phrases and claims of access to his pitch with talk of "private banking," "diplomatic immunity" and "blanket bonds" from the Federal Reserve that would underwrite the payments. After his victims paid the upfront fee, McKuhn told them not to make any additional payments to their banks or to return any phone calls threatening sanctions. Then he disappeared, taking the debtors' fees with him and leaving the victims to face foreclosure, bankruptcy or both.
>
> McKuhn initially preyed on people who had known him for years. He expanded his web by encouraging friends to introduce him to other acquaintances and eventually to their ministers. After tapping into a network of pastors, McKuhn identified several struggling congregations and convinced the church leaders to fork over fees, sometimes to secure a line of credit, sometimes to eliminate debt.
>
> All told, 194 individuals and 22 churches suffered from the fraud. Many lost their homes, barely escaped foreclosure or were forced to declare bankruptcy. One church lost its building, and several others had to restructure their loan agreements and mortgages on less favorable terms. The total losses from the fraud exceeded $3.1 million.

*United States v. McKuhn,* 518 F. App'x 375, 377 (6th Cir. 2013).

A jury trial commenced on February 7, 2011 and, on February 9, 2011, the jury returned guilty verdicts on all counts of the Superseding Indictment. (Min. Entry, *United States v. McKuhn,* No. 2:10-cr-20170-JPM (W.D. Tenn.), ECF No. 83; Min. Entry, *id.*, ECF No. 85; Min. Entry, *id.*, ECF No. 86; Jury Verdict, *id.,* ECF No. 92; 02/07/2011 Trial Tr., *id.*, ECF No. 121; 02/08/2011 Trial Tr., *id.*, ECF No. 122; 02/09/2011 Trial Tr., *id.*, ECF No. 123.) At a hearing on May 20, 2011, the Court sentenced McKuhn to concurrent terms of imprisonment of two hundred ten months on each count of the Superseding Indictment, to be followed by a three-year period of supervised release. The Court also imposed restitution in the amount of $2,547,455.49. (Min. Entry, *id.*, ECF No. 101; Sentencing Hr'g Tr., *id.*, ECF No. 124.) Judgment was entered on May 20, 2011. (J. in a Criminal Case, *id.*, ECF No. 102.) The United States Court of Appeals for the Sixth Circuit affirmed. *United States v. McKuhn,* 518 F. App'x at 377.

B.  Civil Case Number 14-2078

On February 3, 2014, McKuhn filed his *pro se* § 2255 Motion, which consists of the § 2255 form, a legal memorandum, an "Affidavit in Support of 28 USC 2255 Motion, to Vacate, Set Aside, or Correct Sentence, by a Person in Federal Custody," and a series of documents. (§ 2255 Mot., *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1; Mem., *id.*, ECF No. 1-1; Aff. in Supp., *id.*, ECF No. 1-2.) The issues presented in the form § 2255 Motion are as follows:

1. "[W]hether the conviction obtained was by use of coerced confession/[t]estimony of Government witnesses" (§ 2255 Mot. at PageID 4, *id.*, ECF No. 1);

2. "[W]hether the United States violated the Constitution of the United States, [i]n lieu of claim of immunity" (*id.*);

3. "OBJECTIONS [t]o the Presentence Investigation Report" (*id.*); and

4. "Affirmative Defense" (*id.* at PageID 5).

On February 26, 2014, Movant filed an IRS Form 1099-C, titled "Cancellation of Debt," that listed McKuhn as the creditor and the "UNITED STATES OF AMERICA U.S. DISTRICT COURT (TN)" as the debtor. (Not. of Filing, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 7.) The document was accompanied by a Notice to the Clerk stating that the docket of the instant matter is accepted for full value and instructing the Clerk to modify the docket to reflect that Movant's debt has been discharged and paid in full. (Exh., *id.*, ECF No. 7-1.)

On April 29, 2014, Movant filed two documents, titled "NOTICE OF DEPOSIT OF GOVERNMENT SECURITIES IN LIEU OF FILING OF BOND FOR COSTS OF ORDERED

RESTITUTION, PENAL SUMS, & OBLIGATIONS DUE, AS A SUPPLEMENTED [sic] UNDER THE INSTANT MOTION FOR SUBSTITUTION OF ASSETS, UNDER THE INSTANT 2255 MOTION TO VACATE, SETASIDE [sic], OR CORRECT A SENTENCE BY A FEDERAL PRISONER" (Not. of Deposit, *id.*, ECF No. 4), and "MOTION FOR SUBSTITUTION OF ASSETS IN LIEU OF 2255 MOTION TO VACATE, SETASIDE [sic], OR CORRECT A SENTENCE BY A FEDERAL PRISONER" (Mot. for Substitution of Assets, *id.*, ECF No. 5). Those filings appear to be in response to a letter to McKuhn from a Paralegal Specialist employed by the United States Attorney asking him to complete a financial statement so that a payment schedule for the restitution obligation can be established. (*See* ECF No. 5 at PageID 64.) McKuhn's submissions state that he has filed an instrument with the Clerk to satisfy the restitution obligation.

On June 25, 2014, McKuhn filed a document, titled "ADMINISTRATIVE NOTICE OF DEFAULT & MOTION FOR ORDER OF SUMMARY JUDGEMENT Under Notice of Deposit of Government Securities & Motion for Substitution of Assets Supplimented [sic] under the instant 2255 Motion to Vacate, Setaside [sic], & correct Sentence By A Federal Prisoner," which sought summary judgment on his application to discharge his restitution obligation. (Not. of Default & Mot. for Summ. J., *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 6.)

The Court issued an order on October 8, 2014, that, *inter alia,* stated that Movant's various filings about his restitution obligation are not appropriately considered in a § 2255 proceeding (Order at 2, *id.*, ECF No. 8), stated that the Government is not in default and denied summary judgment (*id.* at 3), and directed Movant to file an amendment on the official form within twenty-eight days (*id.* at 6). Movant was instructed that it was not necessary to re-submit

6

the issues that were presented in the original form motion and that, if he failed to file his amendment within the time specified, "the Court will proceed on the issues presented in the original form 2255 motion (ECF No. 1)." (*Id.*) Movant has failed to file an amendment, and the time within which to do so has expired.

## II. THE LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a),

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively

> outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the movant demonstrates cause and prejudice sufficient to excuse his failure to raise those issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a movant may obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *see also DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (same).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his or her recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion."). Movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

### III.   ANALYSIS OF MOVANT'S CLAIMS

#### A.   The Alleged Use of Coerced Testimony (Claim 1)

In Claim 1, McKuhn argues that "the conviction obtained was by use of coerced confession/[t]estimony of Government witnesses." (§ 2255 Mot. at PageID 4, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1.) The factual basis for this issue is the following:

> The United States, Asst. U.S. Attorney of record, deliberely [sic] coached the witness testimony of "Eugene Reeves whom was a part/leader of all opperations [sic] in the offense against the United States. The testimonies were not supported by a lawful contract to support the Government's claims, and the defendant has not contract with the Government, "United States" as the victim.

(*Id.*)

McKuhn's presentation of Claim 1 is largely incomprehensible. Eugene Reeves, the bishop of New Life Anointed Ministries in Woodbridge, Virginia, testified in support of Counts 3, 4, and 6. According to Reeves, he made a wire transfer of $75,000 on June 22, 2009 to the Taurian Worldwide offices in Memphis. (02/08/2011 Trial Tr. 398, *United States v. McKuhn,* No. 2:10-cr-20170-JPM (W.D. Tenn.), ECF No. 122.) That amount was supposed to represent an upfront fee. (*Id.* at 397.) On July 22, 2009, Reeves caused $110,000 to be transferred from New Life Anointed to Taurian Worldwide. (*Id.* at 398.) That amount represented the first monthly payment on a line of credit that had not been established. (*Id.*) On August 25, 2009, Reeves initiated another wire transfer of $85,000 from New Life Anointed to Taurian Worldwide. (*Id.* at 398-99.) He explained that

> [t]hat was supposed to be another 110,000-dollar payment. I did not make the entire payment. I cut it short because I had not seen—the 45 days had come up, and I made a partial payment stating that the remainder would be made when I have seen the effects of the debt being relinquished or the line of credit had gone through.

(*Id.* at 399.)

Reeves also testified that he "had a background in both military and [he] had been the COO of a large company in northern Virginia," and he agreed to help McKuhn "organize his company in order to get it working smoothly and a little bit more efficient." (*Id.*) Reeves agreed to give McKuhn "30 days, no more than 90 days" to "organiz[e] his files and organiz[e] his company" so that the papers for New Life Anointed could be processed. (*Id.* at 400.)

On cross-examination, McKuhn explored Reeves' actions with respect to Taurian. According to Reeves, "I had no authority. All I had was the showing how the company should be organized in order to facilitate the timely moving of files in order to get it together so that people could go and get the files through." (*Id.* at 406.) Reeves admitted that he had spoken to

some pastors who were clients of Taurian. (*Id.*) He testified that "I didn't have any authority other than trying to talk to pastors to calm them down, to see if they understood what we were trying to get out of it, and I assured them I was trying to get to the bottom and find out the truth." (*Id.* at 406-07.) Although Reeves' testimony was less than clear, it appears that he may have held the title of Chief Executive Officer but "it's semantics. If you want to use semantics, it was, but I was acting in order to organize for you." (*Id.* at 407.) Reeves testified that "I did not bring any clients in, but I did refer people to the program." (*Id.* at 410.) He was paid $6000 for his services. (*Id.*)

McKuhn's § 2255 Motion does not present any facts suggesting that Reeves' testimony was coerced. The testimony of Reeves provided sufficient evidence for the jury to convict McKuhn on Counts 3, 4 and 6. The Court of Appeals held on direct appeal that the evidence was more than sufficient to sustain McKuhn's convictions on every count, noting that "[t]he record is replete with evidence of McKuhn's guilt," *United States v. McKuhn,* 518 F. App'x at 377, and "[t]he evidence of guilt was overwhelming," *id.* at 378. Although the jury might have been entitled to conclude that Reeves was somehow a co-conspirator or that New Life Anointed was not defrauded, the jury's verdict on Counts 3, 4 and 6 establishes that they credited the testimony of Reeves.[1]

Finally, McKuhn was not charged with defrauding the United States and, therefore, the Government was under no obligation to show any contractual relationship between the United States and any company controlled by McKuhn.

Claim 1 is without merit and is DISMISSED.

---

[1] At the sentencing hearing, McKuhn argued that he had impeached the testimony of Reeves. The Court noted that "the jury has already ruled on the issue of guilt or innocence," and that the effect of that impeachment evidence could be addressed on appeal. (Sentencing Hr'g Tr. 54, *United States v. McKuhn,* No. 2:10-cr-20170-JPM (W.D. Tenn.), ECF No. 124.)

## B. The Government's Allegedly Unconstitutional Actions (Claim 2)

In Claim 2, titled "whether the United States violated the Constitution of the United States, [i]n lieu of Claim of Immunity" (§ 2255 Mot. at PageID 4, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1), McKuhn asserts that

> [t]he United States Government [p]roved on the [r]ecord that the Defendant accerted [sic] 'Sovereign Immunity' under the Foreign Sovereign Immunity Act[.] Even in the whole of the record the U.S. Attorney's office, [a]cknowledged the status of "McKuhn", but still failed to prove [j]urisdiction on the record, but it is clear "McKuhn" [e]stablished [j]urisdiction on the record, hereto [d]irectly [c]hallenging [j]urisdiction of the U.S. Dept. of Justice, [t]o [p]rosecute.

(*Id.*)

Claim 2 is entirely lacking in substantive merit. There was federal jurisdiction over the criminal case against McKuhn under 18 U.S.C. § 3231, which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the United States." This Court had jurisdiction to hear the criminal case because McKuhn was "indicted by a federal grand jury for offenses against the laws of the United States." *United States v. Fields,* 763 F.3d 443, 453 (6th Cir.), *cert. denied,* 135 S. Ct. 392 (2014), *and petition for cert. filed* (U.S. Nov. 7, 2014) (No. 14-7063).

McKuhn's suggestion that he is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, is frivolous. Even individual officials of foreign governments who are sued for acts undertaken in their official capacities are not covered by the FSIA. *Samantar v. Yousuf,* 560 U.S. 305 (2010). More fundamentally, the § 2255 Motion provides no factual support for McKuhn's claim that he is either a foreign state or an agent or instrumentality of a foreign state. *See* Rule 2(b)(2), § 2255 Rules.[2]

---

[2] At the sentencing hearing, McKuhn attempted to obstruct the proceedings with spurious claims to be the master and operator of a vessel and a foreign diplomat. (*See* Sentencing Hr'g

Claim 2 is without merit and is DISMISSED.

### C. The Challenge to Movant's Sentence (Claim 3)

In Claim 3, titled "OBJECTIONS to the Presentence Investigation Report" (§ 2255 Mot. at PageID 4, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1), McKuhn argues that

> [t]he United States maintains a General Objection was made[.] The Defendant herein makes collateral attack of the Judgement/Commitment Order/And Restitution. I hereby object to [a]ll [a]ctual [l]ossses under the PSR., I challenge the victim Impact Statements, and the [l]osses there of no victim(s) appeared at trail [sic], no contract to validate the claims, and the defendant made an [a]ffirmative [d]efense accepting all charges for full value under the Uniform Commercial Code, and hereto adjusted under the 1099A, 1099 OID, 1099 LTC, filed with the IRS, [t]endering [a]ll [d]ebt owed to the USA.

(*Id.*)

Claim 3 is not cognizable in a § 2255 motion because it could have been raised on direct appeal. *See supra* pp. 7-8. Errors in the application of the sentencing guidelines cannot be litigated in a § 2255 motion. *Grant v. United States*, 72 F.3d at 506; *see also United States v. Lankford*, Nos. 99-5870, 99-6075, 2000 WL 1175592, at *1 (6th Cir. Aug. 9, 2000) ("Technical violations of the federal sentencing guidelines will not warrant [§ 2255] relief."); *United States v. Norfleet*, No. 98-1311, 1999 WL 1281718, at *5 (6th Cir. Dec. 28, 1999) ("Normally, Norfleet could not obtain collateral review of sentencing guidelines errors."); *Hunter v. United States*, 160 F.3d 1109, 1114 (6th Cir. 1998) ("Relief is not available in a section 2255 proceeding for a claim of nonconstitutional, sentencing-guideline error when that error was procedurally defaulted through the failure to bring a direct appeal."). It is also far too late for McKuhn to assert

---

Tr. 9-10, 33-34, 57, *United States v. McKuhn,* No. 2:10-cr-20170-JPM (W.D. Tenn.), ECF No. 124.) The Court addressed the merits of McKuhn's jurisdictional challenge at a hearing on his request to proceed *pro se.* (11/16/2010 Hr'g Tr. 11-12, *id.*, ECF No. 119.) Had McKuhn believed that issue to have merit, he could have raised it on direct appeal.

objections to the guideline calculations and restitution amount because those issues should have been addressed at the sentencing hearing and on direct appeal.

McKuhn argues that the failure to file specific objections to the presentence report was attributable to the ineffective assistance of counsel. (§ 2255 Mot. at PageID 5, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1.) Movant overlooks the facts that he proceeded *pro se* at trial and at the sentencing hearing. (*See* Min. Entry, *United States v. McKuhn,* No. 2:10-cr-20170-JPM (W.D. Tenn.), ECF No. 64; 11/16/2010 Hr'g Tr. 20-22, *id.*, ECF No. 119.) Although the Court appointed Samuel Perkins as standby counsel, McKuhn objected to Perkins' presence in the courtroom during the sentencing hearing. (Sentencing Hr'g Tr. 5-6, *id.*, ECF No. 124.)

Because McKuhn waived his right to be represented by counsel, he cannot complain of ineffective assistance. The Court of Appeals addressed this argument in another case in which a defendant represented himself at sentencing:

> Holmes represented himself at sentencing, and only had an attorney present as stand-by counsel. Nonetheless, Holmes complains that his trial counsel, who was at the sentencing in the role of stand-by counsel, did not object to the calculation of Holmes's criminal history score. "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *Faretta v. California*, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Holmes knowingly and voluntarily elected to assert his *Faretta* rights and proceed at sentencing *pro se*. He does not challenge that waiver. Because he validly waived his right to counsel, his claim for ineffective assistance at sentencing fails. "By exercising his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel." *Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008). Even if standby counsel failed to act in some manner, such failure is an incidental effect of Holmes's decision to assert his *Faretta* rights, and not the basis of an ineffective assistance of counsel claim. *See id.* at 697 ("To the extent [stand-by counsel] failed to act during trial, [the criminal defendant] merely suffered the consequences of his decision to proceed *pro se*."). We will not impose upon stand-by counsel the same obligations that an attorney would have if Holmes were not proceeding *pro se*.

*Holmes v. United States,* 281 F. App'x 475, 480-81 (6th Cir. 2008); *see also Censke v. United States,* No. 2:14-cv-179, Criminal Case No. 2:08-cr-19, 2014 WL 4542488, at *6 (W.D. Mich. Sept. 11, 2014) ("Censke wants the best of both worlds; the ability to represent himself and when things go awry to blame his standby counsel. When a defendant exercises his right to represent himself, he necessarily waives his constitutional right to be represented by counsel. . . . Cenke's standby counsel was appointed to assist Censke not represent him. Therefore, all claims of ineffective assistance of counsel against standby counsel do not entitle Censke to relief."); *Fletcher v. United States,* No. 3:12-cv-00830, 2013 WL 2237880, at *8 (M.D. Tenn. May 21, 2013) (same).

Claim 3 is without merit and is DISMISSED.

### D. The So-Called "Affirmative Defense" (Claim 4)

In Claim 4, titled "Affirmative Defense" (§ 2255 Mot. at PageID 5, *McKuhn v. United States,* No. 2:14-cv-02078-JPM-tmp (W.D. Tenn.), ECF No. 1), McKuhn states that

> [t]he Defendant has filed a Settlement Proposal Contract under the federal Acquisition Regulation, (GSA) with GSA Surety, bid, performance, and payment [b]onds, Release of Lien & Escrow, for the substitution of all assets in the custody of the United States District Court, U.S. Dept. of Justice, Bureau of Prisons, Corrections Corp. of America, the settlement proposal causes for the termination of all [illegible] contracts, held by the Federal Government in the name of the Defendant., the Movant states that the United States has no [i]nterest in the Defendant[.]

(*Id.*)

Claim 4 is not properly considered in a § 2255 motion because it does not allege an error of constitutional magnitude, a sentence imposed outside the statutory limits, or a fundamental error of law. *See supra* p. 7. The averments of Claim 4 are nonsensical and provide no basis for vacating McKuhn's conviction or sentence.

Claim 4 is without merit and is DISMISSED.

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), § 2255 Rules. The Court finds that a response is not required from the United States Attorney and that the motion may be resolved without an evidentiary hearing. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003); *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999). Movant's conviction and sentence are valid and, therefore, his § 2255 Motion is DENIED. Judgment shall be entered for the United States.

**IV.      APPEAL ISSUES**

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir.

2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, for the reasons previously stated, the issues raised by Movant lack substantive merit and, therefore, he cannot present a question of some substance about which reasonable jurists could differ. The Court therefore DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[3]

---

[3] If Movant files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days.

IT IS SO ORDERED, this 29th day of April, 2015.


                                                s/ JON PHIPPS McCALLA
                                                UNITED STATES DISTRICT JUDGE